Koss Construction Company *v.* Vanderburg.

Opinion delivered March 7, 1932.

*Buzbee, Pugh & Harrison,* for appellant.

*Arthur Cobb* and *Murphy & Wood,* for appellee.

HART, C. J. This is an appeal by Koss Construction Company, a corporation, from a judgment rendered against it for damages on account of the personal injury of G. L. Vanderburg, one of its employees, alleged to have been caused by the negligence of appellant.

G. L. Vanderburg was a witness for himself. According to his testimony, he was twenty-eight years of age at the time he was injured, and had been engaged as an employee on construction work since he was fourteen years of age. He commenced to work for appellant some time in August, 1930, and continued to work for it until he was injured along about the 23d day of December, 1930. He was employed as a concrete finisher at the time he was hurt. Appellant was engaged in building a bridge across a stream on a public highway; and, at the particular time in question, was finishing concrete on the bridge. After the concrete is poured, it is necessary to smooth it up and finish it, to prevent it from setting in a rough and irregular way.

Herbert Legler was superintendent of construction for appellant. He was over all the employees and could tell each one what part of the work to do, and whom to obey. About three or four weeks previous to the accident, Legler told appellee to help W. E. York at any time he might need assistance. At that time, the construction company had taken over the ferry at the stream over which the bridge was being constructed, and York was operating the ferry. On the occasion in question,

the river was rising, and York had to have assistance to raise the cable by which the ferry was operated. Appellee was not called upon by York at any other time until the date of the accident.

On that day, Ira Ware was left in charge of finishing the concrete after the day's work was done. At the same time, Legler told appellee to stay and help Ira Ware smooth the concrete. W. E. York was night watchman, and he had charge of furnishing the electric light by which Ware and appellee worked. Between eight and nine o'clock in the evening, York called to Lee Ware to come down there because the water was out of the boiler. Ware told appellee to go down and do whatever York told him to do. When appellee got down to the pumping place, York had turned the lights off and was throwing the fire from the boiler in order to prevent it from exploding. Appellee went down and started the pump, but could get no results.

York then told appellee to go up on the hill, climb upon the tank, and see why the water wasn't passing into it. The tank was sitting upon beams about sixteen or eighteen feet above the ground. There were cross braces nailed to the beams in order to strengthen and support them. At the top of the beams and surrounding the bottom of the tank were pieces of lumber two by six inches in diameter with the edge side up. These were placed there for the purpose of steadying the tank. There was a piece of two-inch pipe fastened about six feet from the bottom of the tank through which the water was carried to the top of the tank. The water pipe was not fastened at the top of the tank on the occasion in question, but appellee did not know of this fact.

Pursuant to the directions of York, appellee climbed upon the cross braces, and put his left foot up on one of the two by six pieces, and then caught hold of the two-inch water pipe to brace himself, so that he could climb up on by the two by six pieces and look into the tank to see if the water was flowing into it through the pipe.

There was nothing to stand upon except the two by sixes, which, as above stated, were placed around the tank to keep it from rocking. York did not explain the conditions surrounding the tank to appellee, and he did not know what they were. When he caught hold of the water pipe with his left hand, it pulled off of the tank at the top and caused him to fall and strike on some lumber about eighteen feet below, injuring him severely. On cross-examination, appellee stated that he had worked for three years for the Texas Utilities Company, which used the same kind of tanks. This company required the water pipes to be securely fastened to the tank. When appellee caught hold of the water pipe, his foot slipped, and he went downwards, carrying the pipe over the edge of the tank with him. He was shaken loose and fell on a piece of timber on his right hip. His head was about a foot and a half or two feet above the top of the frame at the time. He had hold of the pipe with his left hand, and when his foot slipped, he started falling, and the pipe came over with him.

According to the testimony of Ira Ware, Legler told him to stay there and finish smoothing the concrete, and that he was leaving appellee there to help him. Ware supposed that he was the one to see that the concrete was finished, and that it was his business to direct appellee in the work. He does not know what happened after he told appellee to leave the bridge and go to the assistance of York. Other testimony for appellee tended to corroborate the above.

W. E. York was one of the witnesses for appellant. According to his testimony, he was night watchman at the time of the accident, and also ran the ferry boat. He did not boss appellee or any one else. On the evening of the accident, York asked appellee to come down and help start the pump. After starting the pump, they did not know whether or not the water was flowing into the tank. York first went up and listened and could not hear the water flowing into the tank. He then told appel-

lee, who had had more experience in matters of that sort, to go up and see about it. He did not tell him to climb up on the tank.

According to the testimony of Herbert Legler, he was superintendent of appellant, and appellee and Ira Ware were common laborers. W. E. York was night watchman. He had no authority over any of the men. The water pipe was placed up the side of the tank in order to carry water to it. It was not necessary nor was it intended to be used for the purpose of climbing upon the tank. There was a ladder near there which could be used for that purpose, for it was necessary to find out whether the water pipe was stopped up with sand or other matter. The ladder was standing within ten feet of the tank at the time the accident occurred.

In rebuttal, another employee of the company testified that he had climbed the cross braces two or three times in the daytime to see if the water pipe had become clogged up. He said that there were ladders around there but none at the tank.

The principal contention of appellant for a reversal of the judgment is that York was not its vice principal, and had no authority to direct or to command appellee to climb upon the tank in the night on the occasion he was injured.

On the other hand, it is sought to uphold the judgment on the ground that the service which appellee undertook to perform at the time he was injured was required by a superior servant, and was such as to demand that he act at once. Hence, it being an emergency calling for promptness and rapidity, it would be unreasonable to require of him that care and scrutiny of his place of work as would be the case where there was time for observation and deliberation. The claim is that the case falls squarely within the doctrine announced in *Southern Cotton Oil Company* v. *Spotts,* 77 Ark. 458, 92 S. W. 249; and *Michigan-Arkansas Lumber Company* v. *Bullington,* 106 Ark. 25, 152 S. W. 999, and other cases of this court.

It is insisted that the fact that appellee was directed by York to climb the tank and see if the water pipe had been clogged up created an emergency, and that he had no opportunity to examine the place and discover the danger he was about to encounter. In this situation, it is claimed that the doctrine of assumed risk is inapplicable, and that appellee cannot be held to have assumed the risk of a danger about which he knew nothing and had no opportunity to inform himself.

Many other cases calling for the application of the doctrine above announced have been decided by this court, and the doctrine has been applied according to the facts of each particular case. Therefore we do not deem it necessary to cite or review these cases.

We do not think this is a case calling for the application of the doctrine. There was no evidence from which the jury might have found the existence of facts to make either Ware or York a vice-principal. The most that can be said of Ira Ware is that he was left in charge of smoothing out the concrete, and had no other duty to perform on the occasion in question. Appellee was left to help him in this work, and there is nothing to show that Ware had the control or jurisdiction over the other employees. There was nothing about the work which would require Ware to be in superintendence and control of the other workmen as vice-principal. It is not the law that, because two or more men are engaged in the same work, the duty of supervision of one of them over the others, follows as a legal obligation. To put the mere details of the work under one man does not make him a vice-principal over the others. If such was the case, in every piece of work, whether hazardous or not, it would be necessary to employ one person to oversee the others. Ware was merely the leader of the work of smoothing the concrete, and appellee was left to assist him. It is a matter of common knowledge that, in plough gangs and persons engaged in hoeing cotton, one of them is usually the leader; but this does not give him any

control or supervision of the others. If Ware was not the vice principal of appellant, he could not have directed appellee to have gone into a place of danger, and thereby have relieved him from the doctrine of assumed risk.

But, it is earnestly insisted, York was a vice principal. To sustain this theory, it is pointed out that Legler, the regular superintendent of appellant had on one occasion three or four weeks before the date of the injury, directed appellee to help York whenever he might need assistance in his work of operating the ferry. It is claimed that the general direction given on that occasion warranted the jury in finding that York had general supervision and control over appellee in any part of the work intrusted to his care. In the first place, we think that the only legitimate construction that could be put upon the direction of Legler would be that appellee was to help York in raising the cable by which the ferry was operated, and in other work pertaining to the ferry. As far as the service of York was concerned, there was nothing in the circumstances from which the jury might have inferred that he had any dominion or control over appellee. Ware, appellee and York were all engaged in finishing up the concrete so that it could not set in an irregular manner. The work was harmless and required no supervision. Ware and appellee were directed to smooth the concrete, and York was engaged in pumping water to furnish light for that purpose, and also for the purpose of enabling him better to discharge his duties as night watchman. There is a difference between a leader of a crew of men, merely charged with the duty of overseeing the work, and one in which authority is given to one man to have superintendence, control and dominion over the other men, in order to properly carry on the work.

We think the case falls squarely within the principles of law decided by this court in *Williamson & Williams* v. *Cates*, 183 Ark. 579, 37 S. W. (2d) 88. Ware, appellee and York were all fellow-servants, and neither York nor Ware had supervision, control or dominion

over appellee in the sense that either was a vice principal of appellant. Therefore it was error for the court below to refuse to direct a verdict in favor of appellant under the doctrine of assumption of risk.

It is also insisted that the judgment should be upheld under the rule laid down in *Booth & Flynn* v. *Price*, 183 Ark. 975, 39 S. W. (2d) 717, 76 A. L. R. 957, where it was held that where an emergency exists requiring immediate action to protect the master's interest, the servant has implied authority to employ help, and that the person so called upon is not required to exercise the same care for his own safety as in ordinary cases where no such emergency exists. We do not think that case has any application to the facts of the present case. Appellee was not engaged in an effort to save the property of appellant or to protect the lives of any one for it. As we have had occasion to say in former opinions, courts cannot trespass upon the power and functions of the Legislature. This was an unfortunate accident, which is another case illustrating the justness of a reasonable compensation act; but we can not encroach upon the power of the Legislature by judicial fiat.

The views we have reached above render it unnecessary to consider or to determine the other assignments of error argued in the briefs of counsel. Inasmuch as the case seems to have been fully developed, no useful purpose could be served by remanding it for a new trial. Therefore the judgment will be reversed, and the cause of action will be dismissed here. It is so ordered.